## PEOPLE v BENNETT

1. CRIMINAL LAW—EVIDENCE—REBUTTAL—INCULPATORY STATEMENTS.

It was not reversible error in a first-degree murder trial to admit testimony of conversations of the defendant while in jail to the effect that he had other persons to kill when he got out where defendant had previously taken the stand and denied ever making such statements; the testimony was proper rebuttal for impeachment of defendant's testimony even though it also might possibly be substantive proof of the crime charged.

2. CRIMINAL LAW—WITNESSES—REBUTTAL WITNESSES—INDORSEMENT.

Even if it be necessary to have the names of rebuttal witnesses indorsed on the information, the trial judge has a discretionary right to permit it to be done when the witness is called, and a defendant may not raise the question after conviction.

3. SEARCHES AND SEIZURES—EVIDENCE—MOTION TO SUPPRESS.

A motion to suppress evidence on the basis of a claimed illegal search and seizure must generally be made prior to trial, and it is not reversible error to admit such evidence where no motion was made prior to trial, where defendant's counsel had knowledge of the evidence prior to trial, and where no objection was made when the evidence was offered and admitted.

4. SEARCHES AND SEIZURES—EVIDENCE.

A shotgun was properly admitted into evidence when it was seized from defendant's attic by police officers on the premises to arrest the defendant for the crime charged and where they were invited by the defendant to look in the attic where the evidence was in full view on a table; the officers were legally in the house and legally present where the shotgun lay in open view.

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence § 500.
[2, 5] 21 Am Jur 2d, Criminal Law § 328.
[3] 29 Am Jur 2d, Evidence §§ 425, 426.
[4] 68 Am Jur 2d, Searches and Seizures § 92.
[6–9] 5 Am Jur 2d, Appeal and Error § 896.
[10] 53 Am Jur, Trial § 842.

5. CRIMINAL LAW—WITNESSES—RES GESTAE WITNESSES—INDORSEMENT—EXCEPTIONS.

The general rule requiring all res gestae witnesses to be indorsed on the information and produced for examination at trial has four exceptions which are: (1) when the prosecutor makes a showing of due diligence in attempting to produce the witness; (2) when the testimony of the missing res gestae witness would be merely cumulative; (3) when the res gestae witness was a participant in the crime; and (4) when the identity of the res gestae witness is made known to the defendant during trial, or even before, and defendant does not move for the indorsement or production of the witness.

6. CRIMINAL LAW—ARGUMENT OF COUNSEL—PROSECUTOR'S REMARKS—PRESERVING QUESTION.

The failure of a defendant to raise any objections to claimed prejudicial remarks made by the prosecutor in closing argument precludes appellate review unless a miscarriage of justice would occur from failure to consider the issue.

7. CRIMINAL LAW—ARGUMENT OF COUNSEL—PROSECUTOR'S REMARKS—PREJUDICE.

The Court of Appeals will reverse a conviction based upon a prejudicial remark made during closing argument and not objected to by the defendant at the trial only where the prejudice could not have been rectified by a curative instruction on the part of the trial judge.

8. CRIMINAL LAW—ARGUMENT OF COUNSEL—PROSECUTOR'S REMARKS.

A prosecutor's statements in closing argument to the effect that one or more of defendant's alibi witnesses were not telling the truth, based on inconsistencies in the testimony, do not result in reversible error.

9. CRIMINAL LAW—INSTRUCTIONS TO JURY—PRESERVING QUESTION.

The issue of prejudicial error in a jury charge is waived and cannot be raised for the first time on appeal unless a manifest injustice has occurred where the defendant failed to make any objections to the trial court's instructions as given.

10. CRIMINAL LAW—INSTRUCTIONS TO JURY.

Jury instructions are viewed in their entirety in order to determine if there is prejudicial error.

# Appeal from Recorder's Court of Detroit, Henry Heading, J. Submitted Division 1 February 12,

1973, at Detroit. (Docket No. 14395.) Decided April 25, 1973. Leave to appeal granted, 390 Mich 772.

Allen Bennett was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Luvenia D. Dockett,* Assistant Prosecuting Attorney, for the people.

*Judith K. Munger,* Assistant State Appellate Defender, for defendant.

Before: V. J. Brennan, P. J., and Holbrook and Van Valkenburg,* JJ.

Holbrook, J. Defendant Allen Bennett was convicted of first-degree murder of Jerry Jimerson contrary to MCLA 750.316; MSA 28.548 in a jury trial held May 18, 1971, in Recorder's Court for the City of Detroit, and sentenced to life imprisonment.

Defendant timely filed a notice of an alibi defense, and defendant and several of his witnesses testified in support of his alibi.

The people's medical witness, Dr. Georg Russanow, testified that he performed an autopsy on the body of Jerry Jimerson and determined that: "the cause of death was shotgun wound of the chest, with laceration of the heart and lungs, and hemorrhage; bleeding". John Cunningham, ballistics expert with the Detroit police department, testified

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

that it is not possible to match up shotgun pellets with a particular shotgun.

Demarco Hughey, a witness for the people, testified that he and Jerry Jimerson were together on November 16, 1970, just prior to and at the time of the shooting that evening. He testified in part as follows:

*"Q. [Mr. Rosen, assistant prosecutor]:* Okay. And who went up the stairs first?

*"A.* I did.

*"Q.* And what happened then?

*"A.* As I walking up, I got close to the third floor, and Jerry called out my name, and I turned around and looked, and Bennett had a shotgun on him, looked like sawed off, and another dude run upstairs and jumped on my back.

*"Q.* Now, Allen Bennett, is that someone in the courtroom today?

*"A.* Yes, sir.

*"Q.* Will you point him out, please?

*"A. (Indicating).*

*"Q.* What is he wearing?

*"A.* A suit; a brown suit.

*"Mr. Rosen:* Let the record indicate that the witness is identifying and referring to the defendant Allen Bennett.

*"Q. [by Mr. Rosen]:* You say you saw him with a shotgun?

*"A.* Single barreled.

*"Q.* You saw a barrel?

*"A.* Yes.

*"Q.* And what happened then?

*"A.* This other person ran up and jumped on my back, and as we were fighting the shot went off. And I looked down, you know, and Jerry fell. The other dude was on my back. He ran down the stairs, and Allen— him and Allen Bennett left out, you know, went down the next flight of stairs.

*"Q.* What did you do then?

"*A.* I ran down to the manager's apartment and told her to call the police. Then I ran around to his brother's house.

*       *       *

"*Q.* Now, this other man—the man you say that jumped on your back, did you get a look at him?

"*A.* Slight look.

"*Q.* All right. Could you identify him again if you saw him?

"*A.* I'm quite sure I could.

*       *       *

"*Q.* Do you know of your own knowledge whether or not Jerry Jimerson and the defendant Allen Bennett ever had a fight or an argument?

"*A.* Yes.

*       *       *

"*Q.* And what happened during this fight?

"*A.* I really didn't see, you know, I was in another room, but I broke it up.

"*Q.* You broke it up?

"*A.* Yeah. And they shook hands and Allen left out.

"*Q.* What kind of a fight was it? Was it an argument, or was it a fight?

"*A.* It was a small fight.

"*Q.* It was a small fight. Was anybody throwing any punches?

"*A.* I believe both of them was."

Ronald Jimerson, brother of the deceased, testified that he together with his brother Jerry, Alex Jackson, and Demarco Hughey were at his apartment on the evening shortly before the shooting. Ronald Jimerson further testified that Demarco Hughey and his brother Jerry left the apartment together to go to 641 Prentis and shortly thereafter Demarco Hughey returned stating that Jerry had been shot.

Alex Jackson testified that he became acquainted with defendant Bennett about a month

before the shooting and that Mr. Bennett showed him a sawed-off shotgun and some shirts. Defendant tried to sell him the shotgun. In describing the gun he said the stock and barrel were both sawed off. Mr. Jackson said he told the defendant at the meeting which took place about a month before the shooting that he was not interested in the gun but that he might be interested in buying a couple shirts. He also testified that he advised others who had been offered the shotgun by the defendant not to buy it. Mr. Jackson further testified in part as follows:

"*Q. [Mr. Rosen]:* On Monday, November 16th, of 1970, did you have occasion to be at Ronald Jimerson's apartment?

"*A.* Yes.

"*Q.* And who was there with you?

"*A.* Well, at first it was Ronald, Demarco Hughey, myself, and someone else might have been there; I'm not sure, but I definitely remember those four people, you know, including myself.

"*Q.* And was Jerry there?

"*A.* Yes, and Jerry; yes.

"*Q.* And—

"*A.* I thought—did I mention him? He was there. He was definitely there.

"*Q.* And what time did Jerry arrive, if you know?

"*A.* I don't remember the exact time, but he came with Demarco, and he and Demarco were together.

"*Q.* And how long did he stay there?

"*A.* It wasn't too long; he didn't stay too long, you know. We talked, you know, and, you know, joked around, and he and Demarco left together. And it seemed like it was only a few minutes, you know, when Demarco was back knocking on the window, and, you know, we got mad. We said who's knocking on the window, like this, you know, and we jumped up. It was Demarco. We let him in.

"He said, 'Come right away, Jerry's been shot.' And

we all rushed around, and, you know, Jerry was laying there in the hallway.

*  *  *

"*Q.* Do you know of your own knowledge whether or not the defendant Allen Bennett and Jerry Jimerson ever had an argument or a fight?

"*A.* Yes, I—you know, I remember they had a fight, but, everybody was under the opinion that they had made up. You know, before they separated, you know, Jerry had apologized and Allen had apologized too, at first, you know.

"*Q.* When was this? Before the shooting, how long?

"*A.* Seemed like it was just a couple days, you know."

John Alvin, a casual friend of defendant Bennett, testified in part as follows:

"*Q. [Mr. Rosen]:* And did the defendant ever try to sell you anything?

"*A.* Yes, he tried to sell me a sawed-off shotgun. It had been sawed off at the barrel and at the butt; he had a ball of big black tape around the butt of it.

"*Q.* And when did you see this gun?

"*A.* Oh, I saw it on several occasions.

"*Q.* And where at?

"*A.* I saw it down at this apartment 107, and then went out to his house out in Highland Park and he showed it to me out there.

"*Q.* The defendant's house?

"*A.* Yes.

"*Q.* And how much was he asking for it, do you know?

"*A.* No.

"*Q.* And at the time that he showed it to you in the apartment on Prentis, did he have it in a bag or what?

"*A.* No, he had it down in his pants; up under his coat.

"*Q.* Down in his pants, under his coat?

"*A.* Yes. It was a Levi outfit."

Mrs. Jessie Steele, a resident of apartment 303 at 641 Prentis, testified in part as follows:

"*Q. [Mr. Rosen]:* Mrs. Steele, on Monday, November the 16th of 1970, were you living at 641 Prentis?

"*A.* Yes.

"*Q.* What apartment?

"*A.* 303.

"*Q.* And were you home at approximately 5 or 5:30 in the evening?

"*A.* I was coming home.

"*Q.* You were coming home?

"*A.* Yes.

"*Q.* And what, if anything, happened that you saw?

"*A.* Well, when I passed I seen this man sitting on the bannister.

"*Q.* By this man, are you referring to someone who is present in court?

"*A.* Yes.

"*Q.* Would you point him out, please?

"*A.* This man here *(indicating).*

"*Mr. Rosen:* Let the record indicate the witness is referring to and identifying the defendant Allen Bennett.

"*The Witness:* Yes.

\* \* \*

"*Q. [Mr. Rosen]:* Now, you saw him sitting on the bannister, you say?

"*A.* Yes.

"*Q.* Where was this?

"*A.* On the third floor landing.

"*Q.* On the third floor landing?

"*A.* Yes.

"*Q.* Was he with someone, or was he alone?

"*A.* It was someone with him, but I couldn't tell who it was, because he was standing further back on the steps, so I couldn't see.

"*Q.* And what happened then?

"*A.* Well, I heard some tussling after that, but I got my door open and went on inside, so I didn't see what happened.

"*Q.* You heard some tussling?

"*A.* Yes.

"*Q.* But you didn't see what happened?

"*A.* No, I didn't.

"*Q.* Did you hear any shots?

"*A.* Well, I heard a shot after I got inside of my place, but I didn't come back out then.

"*Q.* Did you notice if the defendant was wearing any —was carrying anything?

"*A.* No, he didn't have anything in his hand when I seen him; he was just sitting there."

Mr. William Blocker testified that he saw the defendant at apartment 308 of 641 Prentis on the evening of November 16, 1970, and further testified in part as follows:

"*Q. [Mr. Rosen]:* Was it just getting dark out?

"*A.* No, it had gotten dark.

"*Q.* It had gotten dark. And did Allen Bennett say anything to you about Jerry Jimerson at that time?

"*A.* Yes. When I saw him he told me that—he asked me had I—did I know anything about the fight that he and Jerry had had. And I told him no.

"And he told me that Jerry and them had jumped on him.

"So I said, 'When did this happen?' Because I hadn't seen Jerry and Demarco, I hadn't seen them in about two or three days. So I asked him, 'When did this happen?'

"He told me, he said, 'It happened a few days ago.' And he said, like, Jerry jumped on him; he was talking to Demarco in an argument about some money and something like this, and that Jerry took it up, you know, and that he told Jerry, he says, 'Jerry, if you jump on me, man,' he said, 'you are going to have to kill me, because if you don't, I'm going to get you back,' you know.

"So, he just, you know,—we talked for a minute, and then like he said, 'Okay, I'll see you later.' Because Jerry and them had left. He told me, 'Well, I'll see you

later.' And he left out of the apartment, you know. I didn't see him no more.

"About five or ten minutes later I heard some screaming, and after I heard the screaming, I heard the shot, you know. And we ran down the steps and—me and another guy of the name Urie—and got down to the bottom steps at the second floor—third floor, and there was Jerry fallen in a pool of blood.

\* \* \*

"*Q.* Do you know whether or not he ever had a shotgun?

"*A.* Yes, I do.

"*Q.* How do you know this?

"*A.* Well, I have seen him with a shotgun before. Because like he came down to a place that we used to go to, and tried to pawn it, and I saw it then.

"*Q.* What kind of a shotgun was it?

"*A.* It was sawed off, and it was a single-barreled shotgun; it was about so long. I think about like this *(indicating);* about this long.

"*Q.* By this long, you mean about—

"*A.* You know, the barrel is about this long, and the handle is all together; it is about this long *(indicating).* It was a sawed-off shotgun. Sawed off.

"*Q.* Can you tell us approximately how long it would be in feet, for the record.

"*A.* I would say a foot and a half, I guess; two feet."

Witness John Roffey of the Detroit police department testified concerning the arrest of the defendant and seizing of the shotgun in pertinent part as follows:

"*A.* We knocked on the door and was admitted, I believe, by his sister. I am not sure on that. We asked if he was there, and she stated he was; he was upstairs. She went upstairs and got him. He came downstairs.

"He was in his pajamas, and we informed him that he was a suspect in a murder case, and that we were going to take him downtown for a showup. And if he

was picked out in the showup, he would be charged with murder.

"And at this time I advised him of his constitutional rights, that he did not have to answer any questions that I asked him.

"That he could have counsel with him. If he could not afford counsel, the court would afford him a counsel free of charge.

"*Q. [Mr. Rosen]:* What happened then?

"*A.* At that time we went up to his bedroom where he got dressed. And at the time when we were in the bedroom we asked him if he had a green army fatigue jacket. And he stated he did not. And he pointed to his closet and he said, 'These are my clothes; you can look.'

"We looked in the closet and did not find such a jacket. As he—at this time he was dressed; we began walking him out of the house, he mentioned, 'I have some clothes in the attic, if you want to look at them, you can.'

"At this time we went up in the attic. As we walked into the attic—

"*Q.* Where was the defendant at this time?

"*A.* We were right at the doorway of his bedroom, as I recall, starting to go downstairs; we were getting ready—

"*Q.* That's when he said about the attic?

"*A.* This is when he stated he had some more clothes in the attic.

"*Q.* When you went to the attic, where was the defendant at this point?

"*A.* He was with us.

"*Q.* Okay.

"*A.* We went up to the attic. As you go upstairs to the attic, there is a bed and there was a night stand, and there was a clothes closet at the foot of the bed. As we walked into the bedroom we observed two parts from a sawed-off shotgun on a dresser right by the bed.

"*Q.* And did you confiscate it?

"*A.* Yes, we did."

A police officer, Erich Bohn, was called to the

scene just shortly after the shooting and made a written report. The contents of a part of this report was introduced in evidence upon the cross-examination of John Roffey by defense counsel. Mr. Roffey stated that the report indicated that shortly after the shooting, officer Bohn talked to an Ann Shannon who was walking her dog at the rear of 641 Prentis at 7 p.m. and she stated at the time of the shooting she saw three men run from the scene. Officer Roffey testified also of several efforts to locate Ann Shannon but without success.

Bobby Brown was the people's last witness in its case in chief and testified to a fight between the defendant and the deceased that occurred on the Friday night before the shooting. Further, he testified that he did not know that Allen Bennett had a shotgun.

Defendant Bennett presented alibi witnesses Charles Hardaway, John W. Shell, Elise English (girlfriend of the defendant), Minnie Harris (mother of the defendant), and Amos Harris (stepfather of the defendant) who each testified of seeing the defendant at his home on Glendale in Highland Park on November 16, 1970, but none of these witnesses were able to state that they saw the defendant between 5:30 p.m. and 7:30 p.m. that date. Shirley Bennett (sister of the defendant) and Savannah Harris (stepsister of the defendant) testified that the defendant was present at his home the afternoon and evening of November 16, 1970, and did not leave the house. Miss Bennett also testified in pertinent part:

"*Q. [Mr. Rosen]*: Did anybody come to the door looking for Allen?

"*A.* Yes, about—I think it was about 10 o'clock a young man came to the door and he asked for Allen. And when he asked for him I didn't quite catch the

name. And I went to get Allen. I was on the landing and he ran off of the porch.

"So I went back and looked out of the glass, and he ran down the street to the white car, and he got in the car and they drove off.

"And then I went back upstairs to ask my mother, you know—I went upstairs to tell my mother and father, you know, what had happened, and Allen was in the bed. And my father told me that the same thing happened to him about 7 o'clock. And he went upstairs to get Allen.

"*Q.* Did anyone ever come to the door, that you answered, and you told them that Allen wasn't home?

"*A.* No.

"*Q.* You didn't tell anybody that night that Allen wasn't home?

"*A.* No. I told that young man that he was at home, and I was going to get him.

\* \* \*

"*Q. [Mr. Ambrose, defense attorney]:* Now, Miss Bennett, this fellow that came to your house; did you get a look at him?

"*A.* Yes.

"*Q.* Would you be able to recognize him if you saw him again?

"*A.* Yes. I have saw him again.

"*Q.* You have seen him?

"*A.* Yes.

"*Q.* Where did you see him?

"*A.* I saw him sitting out in the hallway.

"*Q.* Do you know what his name is?

"*A.* I think his name is Michael Crittenton.

"*Q.* Did you talk to him?

"*A.* No, I didn't talk to him."

Amos Harris also testified in pertinent part:

"*Q. [Mr. Ambrose]:* Did you go any place that night—

"*A.* Yes.

"*Q.* —after you got home?

"*A.* My wife and I went to Northland.

"*Q*. Do you recall what time you left?

"*A*. About 5:30.

"*Q*. And how long were you gone before you returned?

"*A*. I would say something about an hour and a half, because I was back home about 7 o'clock.

"*Q*. Well, when you left to go to Northland, was Allen still at home?

"*A*. He was.

"*Q*. What was he wearing that day?

"*A*. Pajamas and robe.

"*Q*. And when you returned at approximately 7 o'clock that evening, did something unusual happen?

"*A*. Yes, I would say about 7 or 7:15, somewhere in that neighborhood, and some young man knocked on the door after we got back. I was going to hang my coat up in the closet. So the doorbell rang. I went to the door to see who it was. He said, 'Is Alex home?'

"I say, 'Just a moment, I will get him.'

"*Q*. Did you ever see this person before?

"*A*. No, not to my remembrance.

"*Q*. Well, was it dark outside, or was it—

"*A*. Well, about 7, 7:15; yes, I would say it was dark.

"*Q*. Did you see anybody else there?

"*A*. I didn't, no.

"*Q*. Do you know how the man or the boy got to your house?

"*A*. No, I don't. I just only went—I told him, 'Just a moment, I would go call Al.'

"*Q*. And then what happened?

"*A*. Well, I went to the top of the stepway and yelled for Allen. And I looked back out of the door, the man was gone. There wasn't anybody there.

\*    \*    \*

"*Q*. *[by Mr. Rosen]*: And you said that someone came to the door?

"*A*. Yes.

"*Q*. And he asked for Alex, did you say?

"*A*. He asked for Alex.

"*Q*. And you said just a moment, I will go get him?

"*A.* That's what I said.
"*Q.* Is your son Allen ever called Alex?
"*A.* Did he ever call him? My son ever call him?
"*Q.* No. No. Is your son ever called Alex?
"*A.* No, not until I heard that this came up."

Defendant Bennett testified on his own behalf and stated that he frequented apartment 308 at 641 Prentis for the purpose of purchasing "dope" from Demarco Hughey or Jerry Jimerson. He denied ever owning a shotgun and denied trying to sell a shotgun to Alex Jackson. He admitted having a fight with Jerry Jimerson on November 13, 1970, over a drug purchase. Defendant also indicated that he never left his home on Glendale on November 16, 1970. On cross-examination by the prosecutor the following colloquy took place:

"*Q.* [*Mr. Rosen*]: Did you ever make a statement while you were in jail?
"*A.* To whom?
"*Q.* To another person. That when you got out there was going to be some more murders?
"*A.* No.
"*Q.* You never said that?
"*A.* No.
"*Q.* You never told John Alvin, or Doug, as he is known, that you could get him a job at Great Lakes Steel, because that's where you work?
"*A.* That I could get him a job?
"*Q.* Right.
"*A.* I'm sure I wouldn't say that, because I had no authority to get him a job. I was just a regular employee myself.
"*Q.* You never told him that they were hiring out there and he could get a job?
"*A.* Possibly so.
"*Q.* You never went out there with him because they were hiring?
"*A.* Never went out there with him, no.

"*Q.* And you never showed him a sawed-off shotgun that you tried to pawn?

"*A.* No.

"*Q.* Part of which these are parts that you sawed off?

"*A.* Never.

"*Q.* You saw these parts up in your attic, haven't you?

"*A.* On the day that they pointed them out and they picked them up, yes.

"*Q.* As a matter of fact, wasn't this barrel part inside the hole in the stock part?

"*A.* When they picked it up, yes."

Michael Crittenton, the people's first rebuttal witness testified that he went to defendant Bennett's home on Glendale in Highland Park shortly after the shooting on the evening of November 16, 1970, and was told by the defendant's sister that the defendant was not home. He also testified that he had seen the defendant with a sawed-off shotgun and defendant had attempted to pawn it for drugs at one of the "dope" joints at 641 Prentis.

Shirley Bennett and Amos Harris were then recalled to the witness stand and both refuted the testimony of Michael Crittenton that he was told the defendant was not at home on the evening of November 16, 1970.

Mr. Mathew Williams, whose rebuttal testimony had been temporarily held up pending consideration by the court of its admissibility, was permitted to testify in pertinent part as follows:

"*A.* The third time I saw him was the Wayne County jail.

"*Q.* *[Mr. Rosen]:* And when was this?

"*A.* This was February 26th.

"*Q.* Did he say anything to you?

"*A.* No—yeah, he said, you know, did I—have I seen him before, you know.

"*Q.* What did you say to him?

"*A.* No. You know, he asked me did I live down on Third Avenue. I told him no.

"*Q.* Then did you hear him say anything else?

"*A.* Yes. I heard him talking to some fellows. Sound like he said, 'Just come out of the hole.' And he was talking on the phone for quite a while. Then when he got off, I heard him saying that he had another fellow to kill when he get out.

* * *

"*Q.* And you heard the defendant say this?

"*A.* Yes.

"*Q.* And you are positive it was this man that said it?

"*A.* Yes."

Defendant raises five issues on appeal which we restate and consider in proper order.

I

Was the testimony of Mathew Williams given on rebuttal properly admitted?

The defendant now contends for the first time that Mathew Williams was a res gestae witness, required to be indorsed on the information and presented in the people's main case. There is no showing in the record that Williams was present at the place and time of the shooting, and therefore he was not a res gestae witness. Defendant's contention in this regard must fail.

Defendant further asserts that Mathew Williams' testimony was substantive proof that defendant committed the crime charged. This might possibly be the case, but it appears to this Court that without question it was rebuttal testimony. The people laid the proper foundation for the testimony by asking the defendant: "Did you state to another person while in jail that when you get out there was going to be some more murders?" to

which defendant answered, "No". The testimony of Mathew Williams that while at the jail, "I heard him saying that he had another fellow to kill when he get out", was contrary to the previous testimony of the defendant and tended to impeach such testimony.

The ruling in the case of *People v Bauman,* 332 Mich 198, 205–206 (1952), is applicable to the instant case. The Court stated as follows:

"It is urged that the court erred in permitting witnesses Lawrence A. Geise and Anna Geise to testify as to a claimed quarrel between defendant and his wife in 1940; and in permitting the testimony of Waldo Pease as to a claimed quarrel between defendant and wife during the year 1935. The record shows that on cross-examination defendant denied that he ever hit, kicked or threatened to kill his wife. It appears that Waldo Pease testified that 3-1/2 years before, he saw defendant chasing his wife down a sidewalk. 'She was running and screaming, hollering, "He is going to shoot me." I seen something in his right hand. What it was I don't know, I saw them running in this particular area, maybe 10 or 15 seconds.' It also appears that Lawrence and Anna Geise testified that in the fall of 1940 defendant and wife visited their farm. When the Baumans left the house, Geise and wife heard Mrs. Bauman scream outside in the orchard. They looked out and saw Harold Bauman hitting and kicking his wife. Mrs. Bauman was lying down on the sand screaming, 'Don't kill me, don't kill me, Harold.' This event took place 2 or 3 rods from the house. We note that defendant Bauman did not take the witness stand to deny any of this testimony given in rebuttal. The trial court permitted the introduction of this evidence for the purpose of impeaching defendant's truth and veracity. In our opinion it was not error to permit the jury to hear this evidence. It was proper rebuttal evidence."

We therefore rule that the testimony was people's rebuttal evidence.

The defendant now asserts for the first time that Mathew Williams' name was not indorsed on the information, and therefore permitting him to testify constituted reversible error. In the case of *People v Bauer,* 216 Mich 659, 662 (1921), it is stated as follows:

"McGregor was called by the prosecution in rebuttal. No objection to his testimony was made because his name was not so indorsed. Even if it be necessary to have the names of rebuttal witnesses indorsed, a point not discussed by counsel, the trial judge has a discretionary right to permit it to be done when the witness is called. The defendant may not raise the question after conviction. It is said that his testimony pertained to the people's main case and was not rebuttal. We find that the court sustained defendant's objection for this reason whenever made. His objections in the main were to the form of the question and not that it was not properly rebuttal."

The facts in the instant case are analogous and we rule that no reversible error occurred.

## II

Were the portions of the sawed-off shotgun seized at the defendant's home improperly admitted into evidence?

Defendant claims that there was an unlawful search and seizure of the shotgun, and therefore the admittance of it into evidence was prejudicial to the defendant and constituted reversible error.

It is well settled law in this state that a motion to suppress evidence on the basis of a claimed illegal search and seizure must generally be made prior to trial. *People v Ferguson,* 376 Mich 90 (1965). In the instant case, defendant admits that his trial counsel did have knowledge prior to trial

that the shotgun had been seized by the police at defendant's home when defendant was arrested. Further, the trial court observed that no motion to suppress had been made at the time the matter was up for discussion during trial. The trial court could have ruled that the oral motion to suppress during trial was not timely, and denied defendant's objection to the evidence on that ground alone. *People v Smith,* 19 Mich App 359 (1969). It is also pointed out that no objection was made when the shotgun was finally offered and admitted into evidence.

Of equal importance is that a hearing was conducted outside the presence of the jury to determine if the shotgun should be admitted. Mr. John Roffey of the Detroit police department, one of the arresting officers, testified in pertinent part as follows:

*"Mr. Roffey:* He was dressed in his pajamas, and we went up to his bedroom while he dressed. At the time we asked him if he had a green army fatigue jacket. He stated he did not own such a jacket, and stated, 'As a matter of fact, you can look in my closet,' he said, 'I do not have one.'

"We looked in the closet and could not find an army fatigue jacket.

"As he dressed and we were getting ready to go, he mentioned, 'I have more clothes upstairs, if you want to look at them.'

"As we went upstairs into the attic—as we walked into the attic, there was a bed and a night stand, right by the bed on the night stand was two portions of a sawed-off shotgun.

*"Q. [Mr. Rosen]:* Which portions specifically?

*"A.* The butt and the barrel.

*"Q.* So what did you do then?

*"A.* We confiscated them.

*"Q.* Did you place them into evidence?

"*A.* Yes. He stated at that time they belonged to a cousin of his, who was in, I believe, Alabama.

"*Q.* Is this what you confiscated, people's proposed exhibit 1?

"*A.* Yes, this is it. We placed them on evidence tag 518542, and I placed my initials on the butt here, and also on the barrel some place. Yeah, on the barrel also.

"*Q.* Your initials are on that stock and on that barrel?

"*A.* Yes."

We determine that the arrest of the defendant was legal. There was no search conducted by the officers except that prompted by the defendant himself when he suggested that they look in the closet for a green army fatigue jacket, and then defendant further suggested they look in the attic that he had some clothes up there. The defendant accompanied them to the attic where the shotgun was viewed lying upon a night stand. Upon seeing it the officers seized the gun and confiscated it. Under these facts it appears to the Court that the officers were legally in the house and legally present where the shotgun lay in open view. Under such facts there was no search necessary. The trial judge properly admitted the shotgun into evidence. *People v Hopper,* 21 Mich App 276 (1970); *People v Meadows,* 26 Mich App 675 (1970).

### III

Was defendant denied his constitutional right of confrontation when an alleged res gestae witness was not produced at trial?

The witness in question was Ann Shannon whose name was not indorsed on the information nor produced at trial. The people assert that there is nothing in the record that would establish Ann Shannon as a res gestae witness; that her connec-

tion with the case came about because she was walking her dog in back of the apartment house after the shooting, when she purportedly saw three possible perpetrators of the crime fleeing from the scene. The people further point out that although defendant knew of the witness Ann Shannon, he made no objection to her not being indorsed on the information nor did he demand that she be produced as a res gestae witness. Further the people state that the defendant was satisfied merely to have officer Roffey read into evidence the statement Ann Shannon gave to a police officer the night of the shooting.

Notwithstanding the people's position, we assume Ann Shannon was a res gestae witness for the purpose of deciding this issue. The general rule in Michigan requires that all res gestae witnesses are to be indorsed on the information and produced for examination at trial. MCLA 767.40; MSA 28.980; *Hurd v People,* 25 Mich 404, 415 (1872). The Michigan Supreme Court and this Court have established several exceptions to the general rule requiring production of res gestae witnesses for examination at trial. They are:

(1) When the prosecution makes a showing of due diligence in attempting to produce the witness, *People v Gibson,* 253 Mich 476 (1931) and *People v Kern,* 6 Mich App 406 (1967);

(2) When the testimony of the missing res gestae witness would be merely cumulative, 2 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 605, p 782;

(3) When the res gestae witness was a participant in the crime, *People v Lyle Brown,* 37 Mich App 25 (1971);

(4) When the identity of the res gestae witness is made known to the defendant during trial, or even

before, and defendant does not move for the indorsement or production of the witness, *People v Gibson, supra; People v Rasmus,* 8 Mich App 239 (1967); *People v Love,* 18 Mich App 228 (1969); *People v Printess C Jackson,* 11 Mich App 727 (1968); *People v May,* 34 Mich App 130 (1971); *People v Fuston Thomas,* 36 Mich App 23 (1971); *People v Williams,* 42 Mich App 278 (1972).

The defendant was apprised during trial or before trial of the fact that Ann Shannon was a possible witness, and was further advised the people had tried to locate her without success. Subsequently, during trial defendant had officer Roffey relate what appeared on a police report as to what Ann Shannon had stated to a police officer that evening after the shooting. Defendant did not move for her name to be indorsed on the information, nor did he request that she be produced at the trial.

It is clear that the facts in this case fit within the fourth exception to the general rule herein stated, and therefore defendant cannot now prevail on his claim that it was reversible error for the people not to have produced Ann Shannon at the trial.

## IV

Were the prosecutor's remarks in closing argument prejudicial to defendant requiring defendant's conviction reversed and a new trial ordered?

Initially during the closing argument on behalf of the people, the prosecutor referred the jury to the testimony and argued that, "it becomes the matter of who did the killing. Was it, in fact, the defendant Allen Bennett? Now, what has been the testimony?" The prosecutor then went on to re-

view the testimony of the respective witnesses, first those supporting the people's theory and then the defense witnesses. In reference to the defense the prosecutor stated, "Now, what is the testimony that the defense has presented, and what is the corroboration?" The prosecutor referred to the similarities and inconsistencies in the testimony given by the various defense witnesses and pointed out that as to small details, there was variance.

The objected-to portions of the prosecutor's oral argument to the jury had mainly to do with the testimony of Shirley Bennett, sister of the defendant. After reviewing her testimony in considerable detail the prosecutor stated:

"She also testified that at 3:30 they weren't watching a quiz show, they were watching "Bewitched." It is funny, they all remember "Dark Shadows," but they didn't remember the other shows.

"Shirley Bennett said she thought about it—one of the witnesses, I believe it was Shirley Bennett—she said she thought about it three weeks. She said she thought about it, and she never talked to anybody about what happened on that day, except her mother and father. Yet every other witness—Alicia English, for one, said, yes, Shirley talked to me. Shirley told me that Allen was arrested. And we talked about what happened on that Monday. Then Shirley Bennett didn't say that she denied that. What about these points? Why aren't they matched? Why aren't they being corroborated?

"The little point whether a stretcher was used to take Jerry Jimerson to the hospital, which Ronald Jimerson and Demarco Hughey said wasn't used, and the officer said that's right, it wasn't used. Small details.

"Can a person remember the small details, when they are trying to plan something; when they are weaving that tangled web when first they practice to deceive? The small details are the ones that trip them up.

"Abraham Lincoln said a man does not have a long enough memory to keep his lies straight. These small details."

The prosecutor after reviewing additional testimony stated:

"Now, Shirley Bennett also told us a couple of interesting facts. She said that Ronald—her brother Allen called her twice the day that he was arrested, and said the second time, he said, 'They put me in a showup; I have been identified, and they are holding me.'

"The testimony of the officer, the testimony of Jessie Steele, Demarco Hughey, even the defendant Allen Bennett, that the lineup was not until the next day.

"How could Allen Bennett have been identified and told Shirley Bennett that he was identified in a lineup that had never even taken place, *unless again she got trapped up on the small details. She was going to supply the details. She is supplying the whole story, she might as well supply all the little details, none of which are true.* That is the question you must decide.

"She also testified that someone came to the door, driving a white car, asked for Alex—not Allen, Alex. And that the door was not opened. And that she said she said, 'Just a moment,' or something like that, and when she went to get him, he had left.

"We heard Michael Crittenton testify that he was driving a blue car—light blue top and a dark blue bottom—sure, he went over there that night; he went over there a half hour or an hour after the shooting, which would have been 6:30, 7:30, somewhere in there —that area; he went over there, he knocked on the door —he first rang the bell, there was no answer, so he knocked on the door, and that the defendant's sister came to the door. He asked for Allen, not Alex; Allen. And that she said he is not home. Not that just a moment, I will go get him. She said he is not home." (Emphasis supplied.)

The defendant also complains of the prosecutor's statements in final argument as follows:

"They are interested witnesses, but so is the family of the defense. But Mr. Ambrose said, I talked to them, and I told them to tell the truth.

"Well, I would have expected no less out of Mr. Ambrose. He told them to tell the truth, and that's proper. But because he told them to tell the truth, does that mean they are going to tell the truth, or does that mean they are going to get together—especially Shirley Bennett—get together and figure out a story and pass the word around to her friends, Dark Shadows; Dark Shadows. Her whole story is shadowed with darkness."

Defendant contends that the prosecutor's statements were prejudicial to the defendant and denied him a fair trial which requires his conviction to be reversed. *People v Montevecchio,* 32 Mich App 163 (1971).

The people assert that there was sufficient testimony in the record to raise the necessary inferences alluded to by the prosecutor and justify the prosecutor's comments during closing argument. *People v Cona,* 180 Mich 641 (1914); *People v Morlock,* 233 Mich 284 (1925). The failure of defendant to raise any objections to the claimed prejudicial remarks made by the prosecutor in closing argument precludes appellate review unless a miscarriage of justice would occur from this Court's failure to consider the issue. The standards of review in this type of case is given in *People v Latham,* 32 Mich App 198, 200 (1971):

"The rule is that this court will reverse a conviction based upon a prejudicial remark made during closing argument, only when the prejudice could not have been rectified by a curative instruction on the part of the trial judge, where the prejudicial remark was not objected to at the trial below. Here, the trial judge could have easily corrected the misstatement made by the prosecutor. Therefore, we will not reverse since the remark was not objected to below."

See also *People v Humphreys,* 24 Mich App 411 (1970); *People v Tarpley,* 41 Mich App 227 (1972).

In order to prevail on this issue the defendant must show that the prosecutor's remarks in closing argument are so prejudicial that a cautionary instruction to the jury could not cure the prejudice and a miscarriage of justice would result unless the Court reverses the defendant's conviction.

We are not satisfied that the defendant has demonstrated sufficient prejudice to warrant reversal. The prosecutor's statements are to the effect that one or more of defendant's alibi witnesses were not telling the truth, based on inconsistencies in the testimony. This does not constitute reversible error. *People v Wirth,* 108 Mich 307 (1896) and *People v Poe,* 27 Mich App 422 (1970). The argument did not state or imply that the prosecutor had a personal belief in the guilt of the defendant. The remarks in the instant case are not equivalent to the flagrant violations committed in *Humphreys, Montevecchio,* and *Tarpley, supra,* and therefore do not merit a reversal. *People v Dawson,* 29 Mich App 488, 494–495 (1971).

We also conclude that whatever prejudice resulting from these remarks in closing argument could have been cured by a cautionary instruction to the jury.

## V

Was the jury charge unfair to the defendant?

Defendant asserts that the trial court's jury instructions gave undue emphasis to the people's case. Further, that the instructions implied that only the theory of the people was supported by evidence and that such instructions prejudiced defendant's right to a jury trial. Defendant also asserts that the portion of the jury charge concern-

ing identification was misleading and therefore prejudicial to the defendant.

The people contend that the jury charge when read as a whole contains no prejudicial error. Also that defendant's failure to object to the jury instructions should preclude this Court from passing on the issue on appeal.

The general rule is that where the defendant makes no objection to the jury charge as given, this issue is waived and cannot be raised for the first time on appeal unless a manifest injustice has occurred. GCR 1963, 516.2; MCLA 769.26; MSA 28.1096; *People v Jefferson,* 18 Mich App 9, 13 (1969); *People v Neumann,* 35 Mich App 193, 196 (1971); *People v Spaulding,* 42 Mich App 492, 496 (1972). Defendant failed to make any objections to the trial court's instructions to the jury. Therefore, defendant must show that the jury instructions were so prejudicial as to cause a miscarriage of justice in order to obtain a reversal on this ground.

Jury instructions are veiwed in their entirety in order to determine if there is prejudicial error. *People v Lewis,* 26 Mich App 290, 295 (1970); *People v Fred W Thomas,* 7 Mich App 519, 533– 534 (1967).

After reading the statute pertaining to the charged crime the judge continued with instructions which defendant now objects to, as follows:

"Now, my understanding of this case is that the section of this statute that the prosecution brings this prosecution under is the part which says 'all murder which shall be perpetrated by means of lying in wait.'

"Now see they didn't accuse this young man of poisoning anybody, or that he committed any murder in the perpetration of a robbery, rape or arson or a burglary. They charge that he waited for the deceased, knowing that he was going to kill him. He was waiting

there for that purpose. And when the deceased showed up, he killed him.

"Now, if you believe that theory, and you have the testimony to substantiate that theory, then the defendant would be guilty of murder in the first degree.

"On the other hand, if you feel that the prosecution did not prove these facts and prove them beyond a reasonable doubt, then the defendant would be not guilty."

Later on in the instructions the trial judge gave additional instructions as follows:

"Now, at the outset of all criminal trials the defendant is presumed to be innocent, and that presumption attaches at the outset of the trial; right at the very beginning. Even right now the presumption is there, and the presumption is right now that this young man is innocent. That's the law. And that presumption shrouds him, just like the coat he is wearing, or the robe I am wearing, and it stays with him until you decide individually and collectively that the prosecution has proven beyond a reasonable doubt each and every element of the offense charged against him. And if they can't do that, prove it beyond a reasonable doubt, that presumptions remains; it stays with him, and in that instance you must find him not guilty.

"Now, if they can prove all of the elements of either one of the offenses I have enumerated and explained to you, if they can prove all but one, the defendant is not guilty, because the law says the prosecution must prove each and every element. That is all of the elements beyond a reasonable doubt. And if they do, then you should convict the defendant of one of the three homicides. Either first degree, second or manslaughter. If they can't do that, you will find him not guilty.

* * *

"Now the defendant interposed a defense of alibi. That is a valid defense. I know most of us don't like to hear the word alibi, because you think somebody is making up something. But that is not the alibi we are

talking about in the law. This is a valid defense. It means that the defendant was elsewhere, and he could not have been where the prosecution say he was. Now if he wasn't there, then he couldn't have committed the crime. But the alibi is a valid defense. But do not confuse it with anything you hear like on the television or the movies, it might be different. Or if you think it is an unsavory word or an unsavory sound, do not accept that. Take the definition as I am giving it to you.

"He had a right to interpose that as a defense. The law gives him that right. And he interposed it. And you should give his witnesses the same tests that you give the prosecution's witnesses. You don't impose or apply, rather, a different test to the defense witnesses than you would to the prosecution's witnesses; apply the same test. You know when a person is telling the truth, you just apply those standards of every-day-life to all of the witnesses, the police officers, the alibi witnesses, the complainant and the prosecution's witnesses. Of course, keeping in mind, as I have read to you before, or stated to you, rather, keep in mind the interest that a witness might have in a case—have in this case.

"Now the defendant took the witness stand. He had a right to take the stand. He could have refused to take the stand. The law gives him that right. And the law gives him a right to take the stand, and he took the stand. Apply the same tests to him as you would to any other witness, remembering, of course, he is the defendant in the case."

Finally the following took place at the close of the trial and during final instructions:

"(Whereupon, the following proceedings were held at the Bench, out of the hearing of the jurors:)

"*The Court:* Any objections to the charge?

"*Mr. Ambrose:* No; very good. Do you have something on identification?

"*Mr. Rosen:* I have no objection to the charge.

"*The Court:* On identification?

"*Mr. Ambrose:* Maybe they don't have any in the book; I don't know.

"*The Court:* Well I can give one on you've got to be sure beyond a reasonable doubt.

"*Mr. Ambrose:* We'll have that.

"*The Court:* All right, I will charge it. I think I should.

"*Mr. Ambrose:* Okay. Thank you.

"(Whereupon, the following proceedings were had in open court:)

"*The Court:* Now, members of the jury, certainly there should be no doubt in your minds, if this crime was committed, as the prosecution says it was, that the defendant was the person who committed the crime, if there is a reasonable doubt in your mind as to the identification of the defendant, then your verdict should be not guilty. There should not be any doubt in your mind at all that the identifications given of the defendant and when they were given were correct at the time that they were given, otherwise it might have been somebody else who committed the crime.

"And, on the other hand, if you are convinced beyond a reasonable doubt that the defendant did commit the crime in the manner which the prosecution alleges, then he would be guilty of murder in the first degree, or second degree murder, or manslaughter, if you—whichever one you feel that the facts fit, after apply the law to it, as I have given it to you.

"All right, anything further, gentlemen?

"*Mr. Ambrose:* Nothing further; thank you, your Honor.

"*Mr. Rosen:* Nothing further, your Honor."

In considering the instructions as a whole we conclude that they do not give preferred treatment to the people's claims over the defendant's claims. These portions of the instructions of which defendant now complains do not present this Court with a manifest injustice.

Any possible prejudice created in the instruction last given on identification is cured when the instructions are read in their entirety. Therefore,

this particular instruction does not result in a manifest injustice and does not warrant a reversal.

Affirmed.

All concurred.